IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Walker D. Miller

Civil Action No. 06-cv-00364-WDM-MJW

SHERRY A. STONE,

    Plaintiff,

v.

MICHAEL B. MUKASEY, Attorney General,
U.S. Department of Justice, Bureau of Prisons,

    Defendant.

---

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

This matter is before the Court on Defendant's Motion for Summary Judgment and Memorandum Brief in Support Thereof ("Def.'s Mot.") [Dkt. # 48], filed on October 12, 2007. Plaintiff Sherry Stone filed her response on November 20, 2007 ("Pl.'s Resp.") [Dkt. # 54], and Defendant Michael Mukasey as Attorney General on behalf of the United States Department of Justice and the Bureau of Prisons (hereinafter, "BOP") filed a reply on December 4, 2007 [Dkt. # 55]. Also being considered in connection with defendant's motion is a "Supplemental Affidavit Submission" filed by plaintiff on December 11, 2007 [Dkt. # 61], and a supplemental reply filed by defendant on January 2, 2008 [Dkt. # 64]. I find that oral argument will not materially assist my decision and enter the following order.

**I.    BACKGROUND**

Plaintiff filed her complaint in this action on March 2, 2006 [Dkt. # 1], alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, in

connection with her employment at the BOP's Federal Correctional Institution ("FCI") in Florence, Colorado. Specifically, plaintiff alleges she was unlawfully retaliated against for engaging in protected activity. The following facts are either undisputed or viewed in the light most favorable to plaintiff, the non-movant.

Plaintiff began her employment with the BOP on March 22, 1992. (Pl.'s Depo., Ex. A1 to Def.'s Mot., at 6.) From April 1994 until November 1997, plaintiff was a Facilities Assistant at the administrative maximum ("ADX") prison in Florence, Colorado. (*Id.* at 8, 22.) In November 1997 plaintiff transferred to FCI, where she was employed as Facilities Assistant until her departure from the BOP in 2005. (*Id.* at 22.) At both ADX and FCI, plaintiff worked in the facilities department, which is responsible for the maintenance, construction, and repair of the prison buildings. (*Id.* at 9.)

As Facilities Assistant at both institutions, plaintiff worked directly for the respective Facility Manager. (*Id.* at 11.) Her duties included maintaining the total maintenance system database, generating preventative maintenance work orders, preparing construction updates on major projects, ensuring the department maintained an adequate completion rate, and balancing the departmental budget. (*Id.* at 9–11.) At ADX, she was also responsible for time and attendance record keeping within the facilities department. (*Id.* at 10.) Upon her transfer to FCI, plaintiff served as the backup time and attendance clerk and would perform the accompanying duties only when the primary clerk, Facilities Secretary Tammy McGlothlin, was out of the office. (*Id.* at 23.) Plaintiff testified that she spent approximately two hours every six months on time and attendance matters at FCI. (*Id.* at 24.)

In August 1997, shortly before transferring to FCI, plaintiff filed a formal complaint of discrimination with the EEOC regarding the actions of her supervisor at ADX, James Bauer. (Compl. ¶ 8.) In February 1999 she filed a related lawsuit in this Court against the BOP, asserting causes of action for discrimination and retaliation in violation of Title VII. (*Id.*; *see* Complaint in *Stone v. Reno*, Case No. 99-B-222, Ex. 1 to Pl.'s Resp.) The case proceeded to trial in January 2001, and the court entered judgment on the jury's verdict in favor of the BOP on the discrimination claim and in favor of plaintiff on the retaliation claim. (Ex. 3 to Pl.'s Resp.)

In October 2002, plaintiff applied for the position of General Foreman at FCI, but Rick Harriman, another BOP employee, was selected for the position. (Compl. ¶¶ 10–11.) On January 17, 2003, plaintiff filed a formal complaint of discrimination based on the BOP's selection of Harriman over her for the position. (*Id.* ¶ 10.) In November 2003, plaintiff filed a related lawsuit in this Court against the BOP, asserting causes of action for discrimination and retaliation concerning her non-selection. (*Id.*; *see* Complaint in *Stone v. Ashcroft*, Case No. 03-D-2308, Ex. 4 to Pl.'s Resp.) The parties reached a settlement on July 29, 2004 after a settlement conference with Magistrate Judge Shaffer. (*See* Case No. 03-D-2308, Dkt. # 14.) According to plaintiff, she presented evidence at the settlement conference that Harriman had made false statements on his application for the General Foreman position. (Ex. 17 to Pl.'s Resp. at 1; Pl.'s Supp. Aff., Ex. 18 to Pl.'s Resp., ¶ 7.)

In August 2004, a confrontation occurred in the office between plaintiff and McGlothlin, during which McGlothlin called plaintiff a "fucking bitch" and a "fucking liar." (Pl.'s Depo. at 68.) The warden called a workplace violence committee meeting

regarding the incident, and McGlothlin submitted a letter of apology to the warden and received a letter of reprimand. (McGlothlin Depo., Ex. 7 to Pl.'s Resp., at 24.)

In October 2004, Jesse Banda, the FCI Facility Manager, transferred to another BOP institution. (*See* Affidavit of Jimmy Whitehead, FCI Associate Warden of Operations, Ex. A8 to Def.'s Mot., at 5.) On October 28, 2004, Harriman, who was the General Foreman, was appointed Acting Facility Manager at FCI, thereby becoming plaintiff's acting supervisor. (*Id.*; Pl.'s Depo. at 160.)

On November 9, 2004, Harriman ordered that the key to the cabinet in which the time and attendance files were kept be removed from plaintiff's key ring and added to employee Suzanne Teter's key ring. (Harriman Affidavit, Ex. A4 to Def.'s Mot., at 5; *see also* Ex. A3 to Def.'s Mot.) According to Harriman, this occurred after McGlothlin told him that Banda had previously appointed Teter as backup time and attendance clerk in place of plaintiff. (Harriman Aff. at 4; *see also* Ex. A2 to Def.'s Mot. (memo from Banda dated April 20, 2004 requesting that Teter be appointed backup time and attendance clerk and attend the requisite training)). Plaintiff testified, however, that she was unaware of any decision to remove her time and attendance duties until an employee from the lock shop approached her to take the key on November 9th. (Pl.'s Depo. at 43.) Plaintiff did not turn over the key as requested; instead, she asked Harriman what was going on, and he informed her Teter was now the backup clerk. (*Id.* at 48.)

On November 15, 2004, plaintiff returned to work after taking a couple days off and discovered that the time and attendance key had been removed from her key ring while she was on leave. (*Id.* at 51.) In addition, the cabinet that went with the key had been moved into the office she shared with Jim Johnson, another FCI employee, and

4

the larger of two fireproof safes in their office had been moved to McGlothlin's office. (*Id.* at 51, 64.) According to Harriman, he and McGlothlin determined that the time and attendance files should be kept in fireproof surroundings, so they moved those files into the larger safe, moved the files plaintiff had been keeping in that safe to the smaller safe, and moved the larger safe to McGlothlin's office. (Harriman Aff. at 14.) Plaintiff testified that the files she had kept in the large safe had to be moved into the cabinet and that she had to ask McGlothlin or Teter to unlock it several times to retrieve those files. (Pl.'s Depo. at 64–65.) She and Johnson subsequently relocated non-sensitive files to the cabinet so that it would not have to be locked. (*Id.* at 77–78.)

On November 15, 2004, the same day plaintiff discovered her key to the cabinet had been removed, Harriman instructed plaintiff and Johnson to leave the door to their office propped open throughout the day. (*Id.* at 78–79.) Harriman testified that he did so because he was aware that employees would congregate in the office "and tell untrue stories about supervisors and other people in the department." (Harriman Aff. at 9.) Plaintiff denied that such conversations occurred and testified she kept the door closed to decrease traffic in the office and because she did not want others to hear personal conversations. (Pl.'s Depo. at 142.)

On November 22, 2004, plaintiff spoke to FCI's Associate Warden of Operations, Jimmy Whitehead. (Pl.'s Depo. at 55.) She told Whitehead that she could no longer work for Harriman and that she felt Harriman was beginning to take retaliatory measures against her. (*Id.*) She also requested that Harriman be transferred to a different facility and that she be given a new supervisor or be allowed to work from home. (*Id.* at 55–56.) Whitehead denied her request. (*Id.* at 56.)

In late November 2004, Johnson was transferred, apparently at his request, to a different institution on the complex. (Johnson Affidavit, Ex. A6 to Def.'s Mot., at 11; Whitehead Aff. at 6.) In addition, Harriman informed plaintiff that she would be moving offices; specifically, she would be switching offices with the General Foreman.[1] (Pl.'s Depo. at 79, 86–87.) The two offices were adjacent to each other; however, plaintiff's old office was considerably larger—20 feet x 14 feet compared to 10 feet by 12 feet. (Ex. A5 to Def.'s Mot.) In addition, located in the old office were some common fixtures such as the departmental mailboxes, a coffee pot, sink, and fax machine. (Pl.'s Depo. at 82.) Plaintiff testified that she could not fit all of her filing cabinets into the new office and that many of her files had to be kept in other offices in the department, including her old office. (*Id.* at 90–91, 95–96.) She testified that she did most of the faxing in the department and that it was "totally inconvenient" to have to go to her old office to send faxes or mail, get coffee, use the sink, and retrieve necessary files, particularly when private meetings were being held in there. (*Id.* at 96–98, 100, 103.)

The office move occurred on December 1, 2004. (*Id.* at 143.) The decision to relocate plaintiff had been made during a meeting attended by Harriman, Whitehead, and several others. (Harriman Aff. at 8.) Harriman testified that, as with the prior instruction to plaintiff to keep the door open in her old office, which Harriman described as a "gathering place," his intent in moving her into the new office was to "stop any negativity" and to increase productivity. (*Id.* at 9–10.) Plaintiff testified that Harriman

---

[1] Harriman was a General Foreman; however, because he had been appointed Acting Facility Manager, at that time he was located in the Facility Manager's office.

told her he was moving her so that she would be "isolated and secluded" because she was "the only source of negativity in the department." (Pl.'s Depo. at 110.)

Plaintiff went on medical leave on December 8, 2004, one week after her office was relocated. (*Id.* at 116.) In January 2005, while plaintiff was still on leave, FCI Warden Rios called plaintiff at home and asked how she was doing. (*Id.* at 128–29.) Plaintiff reiterated that she felt Harriman's actions were in reprisal for her prior cases against the BOP and that she could not continue working for him. (*Id.* at 129.) Rios stated that he would not be moving anyone at that time. (*Id.*)

Plaintiff exhausted her vacation and sick leave in March 2005. (Compl. ¶ 16.) She has since qualified for workers' compensation benefits as well as disability retirement. (Pl.'s Depo. at 138–39.) She never physically returned to work at the BOP after going on leave on December 8, 2004. (*Id.* at 116.)

## II.  STANDARD OF REVIEW

Summary judgment is appropriate under Fed. R. Civ. P. 56(c) "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). When applying this standard, a court reviews the pleadings and the documentary evidence in the light most favorable to the nonmoving party. *See Gray v. Phillips Petroleum Co.*, 858 F.2d 610, 613 (10th Cir. 1988). To defeat a properly supported motion for summary judgment, "there must be evidence on which the jury could reasonably find for the" nonmoving party. *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995), cert. denied, 516 U.S. 1160 (1996) (quoting

7

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  In addition, "'where the non-moving party will bear the burden of proof at trial on a dispositive issue' that party must 'go beyond the pleadings' and 'designate specific facts' so as to 'make a showing sufficient to establish the existence of an element essential to that party's case' in order to survive summary judgment."  *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 322).

### III. ANALYSIS OF RETALIATION CLAIM

Defendant moves for summary judgment on plaintiff's single claim for relief, in which she alleges she was retaliated against for engaging in protected activity in violation of Title VII.

#### A. Legal Framework

Title VII bars employers from discriminating against an employee "because [s]he has opposed any practice made an unlawful employment practice . . . or because [s]he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under [Title VII]."  42 U.S.C. § 2000e-3(a).  Title VII protects employees who engage in informal as well as formal opposition to unlawful conduct.  *See Love v. RE/MAX of Am., Inc.*, 738 F.2d 383, 386 (10th Cir. 1984).

The burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to Title VII retaliation claims.  *McGarry v. Board of County Comm'rs of County of Pitkin*, 175 F.3d 1193, 1201 (10th Cir. 1999).  A plaintiff must initially satisfy the requirements for a prima facie case of retaliation by showing that (1) she engaged in protected opposition to discrimination, (2) a reasonable employee would have found the employer's challenged action materially adverse, and (3) there is a causal link between

the protected opposition and the adverse action. *Argo v. Blue Cross & Blue Shield of Kan.*, 452 F.3d 1193, 1202 (10th Cir. 2006). If the plaintiff satisfies her prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. *Id.* If the defendant meets that burden, it shifts back to the plaintiff to prove the proffered explanation is a pretext for retaliation. *Id.* at 1203.

**B.    Prima Facie Case**

*1. Protected Activity*

Defendant does not dispute that plaintiff engaged in protected activity by filing a discrimination complaint in January 2003 concerning Harriman's selection over her for the General Foreman position and filing the related lawsuit in November 2003. Thus, the first element is satisfied. The parties do disagree as to whether plaintiff's participation in the settlement conference with Magistrate Judge Shaffer in July 2004 and execution of the settlement agreement in August or September 2004 also constitute protected activity. As discussed further below, whether the latter two events constitute protected activity under Title VII is relevant to the third element of plaintiff's prima facie case and will therefore be considered in conjunction with that element.

*2. Adverse Action*

In *Burlington Northern & Santa Fe Railway Corp. v. White*, 548 U.S. 53, 126 S.Ct. 2405 (2006), the Supreme Court clarified the standard by which courts must evaluate whether an adverse employment action has occurred in the context of a retaliation claim. Specifically, "[a] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well

might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 2415 (citations and quotation marks omitted). The Supreme Court elaborated as follows:

> We speak of material adversity because we believe it is important to separate significant from trivial harms. Title VII, we have said, does not set forth a general civility code for the American workplace. An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience. The anti-retaliation provision seeks to prevent employer interference with unfettered access to Title VII's remedial mechanisms. It does so by prohibiting employer actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers. And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence.

*Id.* (internal citations and quotation marks omitted). The Supreme Court concluded that, while the standard for judging harm is an objective one, the significance of an employer's action will depend on "the particular circumstances" of each case. *Id.*

The alleged adverse actions in this case can be divided into three categories: (1) the appointment of Harriman as Acting Facility Manager and denial of plaintiff's request for a new supervisor; (2) Harriman's conduct toward plaintiff while he was her acting supervisor; and (3) the confrontation with McGlothlin.

### a. Appointment and Retention of Harriman as Acting Facility Manager

Plaintiff contends that, under the circumstances, there is a fact issue as to whether Harriman's appointment to the position of Acting Facility Manager and the denial of plaintiff's request to change supervisors were material adverse actions under *Burlington*. I agree. Plaintiff's discrimination lawsuit against the BOP, which she filed in November 2003, was based on the selection of Harriman over her for General

10

Foreman. Plaintiff took the position in that lawsuit that she was more qualified for the job and that Harriman had falsified his employment application. (Ex. 17 to Pl.'s Resp. at 1; Pl.'s Supp. Aff. ¶ 7.) Moreover, there is at least some evidence that Harriman was aware of the lawsuit and plaintiff's position therein. (*See* Harriman Affidavit, Ex. 10 to Pl.'s Resp., ¶ 11; Harriman Memo, Ex. 8 to Pl.'s Resp., at 2.)[2]

Given this context, there is a fact issue as to whether the BOP's action—appointing as an employee's direct supervisor the very individual the employee had accused of fraud and incompetence as part of a prior discrimination suit—could have dissuaded a reasonable employee from making a charge of discrimination. The same logic applies to the BOP's refusal of plaintiff's request to change supervisors. Defendant summarily argues that plaintiff's "assign[ment] for one month to a new, acting supervisor, who made one critical comment to her unrelated to her prior EEO activity," is not a materially adverse action as a matter of law. (Def.'s Mot. at 10.) However, in so arguing defendant sidesteps, and indeed ignores, the circumstances surrounding the assignment. When those circumstances are considered, plaintiff has met her burden of establishing an adverse employment action.

### b. Harriman's Actions

Plaintiff also contends that, while Harriman was plaintiff's acting supervisor, he engaged in several adverse employment actions, to wit: removing her duties as backup time and attendance keeper; removing a key from her key ring; removing her files from

---

[2] Defendant argues that Exhibit 8, a memo prepared by Harriman dated May 7, 2005, is inadmissible because it has not been authenticated and because it constitutes hearsay. I find, however, that Harriman's discussion of the memo in his deposition was sufficient to authenticate it and that the memo constitutes a non-hearsay admission of party opponent under Federal Rule of Evidence 801(d)(2). (Harriman Depo., attached to Pl.'s Supp. Aff., at 25–26.)

a safe and moving the safe to a different office; instructing her and Johnson to leave their office door open at all times; and reassigning her to a smaller office.[3] Even under the broad standard set forth in *Burlington*, however, Harriman's actions were not materially adverse as a matter of law.

Plaintiff asserts that the removal of her time and attendance duties was similar to the removal of the plaintiff's job duties found by the Supreme Court to be materially adverse in *Burlington*. This attempted comparison is misplaced. The plaintiff in *Burlington* had been reassigned from forklift duty to track labor duty, and there was evidence that "track labor duties were 'by all accounts more arduous and dirtier'; that the 'forklift operator position required more qualifications, which is an indication of prestige'; and that 'the forklift operator position was objectively considered a better job.'" *Burlington*, 126 S.Ct. at 2417 (citation omitted). In this case, plaintiff spent a minimal amount of time, approximately two hours every six months, on time and attendance duties, which were purely clerical and were primarily performed by another employee. (Pl.'s Depo. at 24.) There is no evidence that such duties were particularly desirable within the department or carried any element of prestige. At most, the reassignment of backup time and attendance duties to Teter amounted to a "trivial harm" to plaintiff that is not analogous to the situation in *Burlington*.

Moreover, plaintiff testified that she became upset not because her duties were removed, but because she was denied access to the cabinet when her key was taken

---

[3] The evidence is not entirely clear as to whether the decision to relocate plaintiff was made by Harriman or Associate Warden Whitehead. The dispute is irrelevant, however, to whether the relocation constituted an adverse employment action.

and because one of the safes was removed from her office. (Pl.'s Depo. at 63.) However, the only apparent effect this had was that, at first, plaintiff had to ask McGlothlin or Teter to unlock the cabinet when she needed access, and she subsequently began keeping non-sensitive files in the cabinet so that it could remain unlocked. (*Id.* at 64–65, 77–78.) While this inconvenience may have been a "minor annoyance," again it does not go beyond the kind of "trivial harm" that is not actionable under *Burlington*.

The same is true of Harriman's instructing plaintiff and Johnson to keep their office door open and plaintiff's relocation to a smaller office adjacent to her old, larger office. Plaintiff's principal complaint about the office move was that she could not fit all of her files in the new office and therefore had to keep some files in other locations in the department. She also was no longer in the office that contained common amenities like the sink, mailboxes, coffee pot, and fax machine. This may well have been inconvenient, and being instructed to leave her old office door open may have been an annoyance, but again, minor annoyances are not significant harms under the *Burlington* standard. Indeed, courts have held similar kinds of actions insufficient to maintain a retaliation claim. *E.g.*, *Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 857 (10th Cir. 2000)[4] (affirming dismissal of plaintiff's retaliation claim because moving her desk, monitoring her calls, being "chilly" towards her, and suggesting that she might do better in a different department were not adverse employment actions); *see also Gilbert v. Des*

---

[4] Although *Heno* was decided before *Burlington*, the Tenth Circuit has recently held that the holding in *Heno* is consistent with the *Burlington* standard. *Samoza v. Univ. of Denver*, 513 F.3d 1206, 1218 n.4 & 1215 n.2 (10th Cir. 2008).

*Moines Area Cmty. Coll.*, 495 F.3d 906, 918 (8th Cir. 2007) (employee's reassignment from office to open office cubicle was not actionable harm even though "new work space may not have been as desirable").

Plaintiff argues that Harriman's actions were "manifestations of [his] power and control as [plaintiff's] supervisor." (Pl.'s Resp. at 22.) In addition, Harriman expressly informed plaintiff that he was moving her office to "isolate and seclude" her because she was "the only source of negativity in the department." (Pl.'s Depo. at 110.) However, Harriman's motive, while perhaps relevant to establishing a causal connection between plaintiff's protected activity and the actions complained of, is simply immaterial to the issue at hand—namely, whether the actions themselves were materially adverse under Title VII and *Burlington*. The purpose behind those actions does not alter their practical effect, which was simply that plaintiff was relocated to a less desirable, less convenient work space. I find that Harriman's actions do not rise to a level that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 126 S.Ct. at 2415. Accordingly, plaintiff may not proceed on her retaliation claim with respect to these actions.

c. <u>Confrontation Between Plaintiff and McGlothlin</u>

Plaintiff points to a single incident in August 2004 in which McGlothlin called her a "fucking bitch" and a "fucking liar." (Pl.'s Depo. at 68.) It is undisputed that McGlothlin was given a letter of reprimand and that no similar incidents occurred again. This single incident is not the kind of pervasive hostility that may constitute an adverse action under Title VII. *Samoza v. Univ. of Denver*, 513 F.3d 1206, 1215 n.2 (10th Cir. 2008) (holding that hostile conduct by co-workers at a single meeting is not an adverse action and

citing with approval case law holding that an "angry outburst" or "ridicule by" co-workers will not support a retaliation claim).

### d. *Plaintiff's Alternative Argument Regarding Adverse Actions under Burlington*

Plaintiff states in her response brief that "the context and language of the *Burlington* [o]pinion suggests [sic] that serious injury or harm would, of itself, make the retaliation actionable." (Pl.'s Resp. at 19.) Plaintiff seems to be arguing here that, because she suffered "massive injuries and harm" in the form of serious medical and psychological problems, and there is evidence tying those injuries generally to events at work, those events could constitute material adverse actions under *Burlington*. (*Id.* at 18–19.)

Even assuming there is admissible evidence linking plaintiff's work experiences to her medical conditions, such evidence is irrelevant to whether *Burlington*'s objective standard of harm has been satisfied. To the extent plaintiff suggests that *Burlington* provides for two alternative standards for judging the adverse action element of a prima facie retaliation case, such a position has no support in the language of the opinion. The Supreme Court does begin its discussion of the appropriate standard by stating: "The anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington*, 126 S.Ct. at 2414. The Supreme Court goes on to state:

> As we have explained, the Courts of Appeals have used differing language to describe the level of seriousness to which this harm must rise before it becomes actionable retaliation. We agree with the formulation set forth by the Seventh and the District of Columbia Circuits. In our view, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have

15

> dissuaded a reasonable worker from making or supporting a charge of discrimination.

*Id.* at 2414–15 (citations and quotation marks omitted).

In so holding, the Supreme Court has set forth the single, applicable standard for evaluating whether an employer's conduct is serious enough to constitute actionable retaliation. That is the standard I have utilized in this case, and pursuant to that standard, only the conduct involving the appointment of Harriman as plaintiff's acting supervisor and the denial of plaintiff's request to change supervisors may constitute adverse actions that in turn may support a retaliation claim.

### 3. *Causal Connection*

Under the final prong of her prima facie case, plaintiff must show that there was a causal connection between her protected activity and the materially adverse actions of appointing Harriman as Acting Facility Manager and denying plaintiff's request for a new supervisor. An inference of retaliatory motive can be drawn when there is "close temporal proximity" between the protected conduct and the adverse action. *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999). However, "unless the [adverse action] is *very* closely connected in time to the protected activity, the plaintiff must rely on additional evidence beyond temporal proximity to establish causation." *Id.* (emphasis in original); *compare Ramirez v. Okla. Dep't of Mental Health*, 41 F.3d 584, 596 (10th Cir.1994) (six-week period between protected activity and adverse action may, by itself, establish causation), *with Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (three-month period, standing alone, is insufficient to establish causation).

As noted above, the parties dispute whether plaintiff's participation in the settlement conference and execution of the settlement agreement in her prior discrimination case against the BOP constitute protected activity, which is relevant to the question of temporal proximity. The Tenth Circuit held in an unpublished opinion that "[t]he relevant date for [a] plaintiff's protected activity is the filing date, . . . not, as plaintiff suggests, the date the lawsuit was settled." *Hansen v. Alta Ski Lifts Co.*, 141 F.3d 1184 (Table), 1998 WL 161147, at *3 (10th Cir. March 31, 1998) (unpublished). Even assuming plaintiff's participation in the settlement conference was protected, it occurred three months before Harriman's appointment as Acting Facility Manager. Accordingly, plaintiff cannot establish causation based on temporal proximity alone and must produce additional evidence of retaliatory motive to meet her burden. *Richmond*, 120 F.3d at 209. Plaintiff has produced no such evidence in this case.

It is undisputed that Harriman was appointed on an interim basis when the then-Facility Manager at FCI, Jesse Banda, was transferred to a different institution. There is no evidence or indication that Banda's transfer itself was suspect and that the Facility Manager position therefore needed to be filled. And it appears that Harriman, as the General Foreman, was appointed pursuant to the normal practice of the department. Plaintiff herself testified that "in the absence of the facility manager the general foreman – one of the general foremen would be the facility – acting facility manager." (Pl.'s Depo. at 33.) Thus, even before Banda was transferred, Harriman had filled in as acting manager at times when Banda was absent or unavailable. (*Id.*) Plaintiff also testified that there had been no issues with respect to Harriman's supervision of her on those occasions. (*Id.*) Moreover, it appears that Harriman was the only General

17

Foreman at FCI at the time Banda was transferred (Johnson Aff. at 14); thus, the BOP did not have multiple foremen to choose from in temporarily filling the manager position. This evidence weighs against any retaliatory motive by the BOP in appointing Harriman.

Similarly, there is no evidence indicating a retaliatory motive in denying plaintiff's request to change supervisors. Notably, plaintiff did not request a transfer to another position at FCI or another BOP institution that would have placed her under a different supervisor. (Whitehead Aff. at 11.) Rather, plaintiff wanted to remain in the same position, but still be assigned a different supervisor. (*Id.*; *see also* Pl.'s Depo. at 55–56). There is no evidence that this was even feasible given that, by virtue of her position, plaintiff necessarily reported to the Facility Manager and that, again, Harriman had been the only logical choice for the position in the first place. That Associate Warden Whitehead and Warden Rios may have been aware of plaintiff's prior lawsuits is insufficient, in and of itself, to establish the necessary causal link.

Plaintiff cites two sources that she asserts constitute direct, independent evidence of retaliatory motive. First, she cites a memo authored by Harriman in May 2005, which was two months after plaintiff filed her formal administrative complaint of retaliation in this case. (Ex. 8 to Pl.'s Resp.) In that memo, which Harriman testified he submitted to Warden Rios, Harriman among other things accuses plaintiff of: spreading lies about him and degrading him in the eyes of other FCI employees; having a problem with authority; and damaging the department. (*Id.*) Harriman also states that plaintiff "has gotten away with a lot of things and she thinks she is running the department, no one better get in her way. She has sued the BOP twice and won. People know how she is. Does this not make it clear what kind of person she is?" (*Id.* at 2.)

This may constitute some evidence of retaliatory animus toward her by Harriman, although given the date of the memo and an accusation therein that plaintiff lied "today," the memo appears to be a response to plaintiff's accusations in the underlying dispute rather than to any protected activity related to her prior discrimination suit. In any event, however, this memo is evidence of Harriman's motives, not those of the BOP officials responsible for appointing Harriman and refusing plaintiff's request for a new supervisor. Because Harriman's actions toward plaintiff were not materially adverse under *Burlington*, evidence of a causal connection between those actions and plaintiff's protected activity is immaterial.

Plaintiff also relies on a class action complaint filed with the EEOC in September 2004 by another BOP employee alleging that the BOP has engaged in a pattern and practice of discrimination and retaliatory activity. (*See* Ex. 16 to Pl.'s Resp.) An administrative judge certified the class, and the certification was reversed on appeal. (*Id.*; Pl.'s Resp. at 28.) Neither the class action complaint nor the subsequently reversed order certifying the class is evidence of retaliatory motive in the instant case. There is no indication that any findings were ever made in that case on the merits, nor does plaintiff attach any evidence submitted in that case to support her own, specific retaliation claim. Contrary to plaintiff's bald assertion, the administrative judge's order does not amount to "voluminous evidence of a pattern and practice of retaliation" at the BOP and certainly does not establish evidence of a causal connection in plaintiff's case.

In sum, because there is no evidence of a causal connection between plaintiff's protected activity and the actions of defendant that were serious enough to constitute materially adverse actions under *Burlington*, plaintiff cannot establish a prima facie case

of retaliation. Thus, her sole cause of action for retaliation in violation of Title VII fails as a matter of law.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment [Dkt. # 48] is GRANTED. The clerk shall enter judgment on behalf of defendant and against plaintiff.

DATED at Denver, Colorado, on April 25, 2008.

BY THE COURT:


s/ Walker D. Miller
United States District Judge